IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


JAMEISHA ANDREWS,            )
                             )
    Plaintiff,               )
                             )    CIVIL ACTION NO.
    v.                       )    2:13cv136-MHT
                             )       (WO)
JOHN WILLIAMS, in his        )
individual capacity, and     )
JEROME McQUEEN, in his       )
individual capacity,         )
                             )
    Defendants.              )

OPINION

Plaintiff Jameisha Andrews brought this lawsuit,
relying on 42 U.S.C. § 1983, against defendant Jerome
McQueen (a Lowndes County, Alabama Deputy Sheriff) and
his supervisor, defendant John Williams (the Lowndes
County Sheriff).  She alleges that McQueen violated her
Fourth Amendment right against the use of excessive
force.  She further alleges that Williams did not
adequately train and supervise McQueen to prevent use of
excessive force.  Jurisdiction is properly invoked

pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343
(civil rights).

The case is now before the court on McQueen and
Williams's motion for summary judgment. For the reasons
discussed below, the motion will be granted.


## I.  LEGAL STANDARD

"A party may move for summary judgment, identifying
each claim or defense--or the part of each claim or
defense--on which summary judgment is sought. The court
shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). The court must view the
admissible evidence in the light most favorable to the
non-moving party and draw all reasonable inferences in
favor of that party. Matsushita Elec. Indus. Co. Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II.  BACKGROUND

The following is a recitation of the facts of the
case with all reasonable inferences made toward Andrews.

Andrews bought her son a mobile phone and instructed
him to carry it with him at his high school.  She was
more than eight months pregnant and worried that she
could go into labor at some point during a school day,
requiring her son to leave school and drive her to the
hospital.  On the day of her tasing, Andrews's son called
her to say that his phone had been stolen, and he
suspected one of his classmates of taking it.  She went
to the school to try to sort out the situation.

Andrews went to the administrative office of the
school and was able to speak with the assistant
principal.  The assistant principal and McQueen, who was
serving as a Lowndes County Sheriff's Deputy and a School
Resource Officer, searched the accused student's
belongings and were able to find a cheaper and less
sophisticated mobile phone.  The assistant principal

3

brought this phone back to the school's administrative office where Andrews was waiting, but she revealed that it was not her son's phone.  The two moved into an inner office, while McQueen stood in the lobby of the administrative offices, behind a reception counter. Andrews demanded that the school continue to look for her son's phone, but the assistant principal refused, saying that she had done all she could.  Andrews grabbed the cheaper phone, saying "Whenever y'all find my son a phone, I'll bring this phone back." Andrews Dep. Defs.' Ex. A (Doc. No. 46-1) at 52:17-18.  It is not clear from the record whether McQueen would have been able to hear Andrews make this statement, but he does not seem to remember it.  See McQueen Dep. Defs.' Ex. B (Doc. No. 46-2) at 93:2-10.

Andrews walked out of the inner office and into the lobby where McQueen was standing.  The assistant principal yelled to McQueen that he should stop her from walking out with the phone.  McQueen rushed behind

Andrews to hold the door to the exterior hallway closed before she could open it.  Since the door opened into the office, she was trapped between the door and McQueen.  He was standing behind her with his arm extended over her, holding the door shut with his hand.  He demanded that she hand him the flip phone, but she refused to relinquish it.

Without warning, McQueen applied his Taser X26 Electronic Compliance Device, in drive-stun mode, to Andrews's chest and shoulder.  She felt a painful "burning sensation going through [her] body ... [her] chest and arm." Andrews Dep. 70:5-8.  After being tased, she gave the flip phone to her son.  The Taser left two burn marks on her chest and shoulder, and she went to the hospital so her OB/GYN could monitor the weapon's effect on her unborn baby.

A warrant was later issued for Andrews on misdemeanor charges of Theft of Property in the Third Degree (1975 Ala. Code § 13A-8-5), Resisting Arrest (§ 13A-10-41), and

Disorderly Conduct (§ 13A-11-7). The charges were dismissed.

A Taser has three main modes of deployment: probe, drive-stun, and three-point. In each mode, some part of a person's body is used to complete an electric circuit. The sensations and consequences of the weapon vary depending on how the circuit is completed.

Probe mode is what many people envision when they think of use of a Taser. In probe mode, two electrically charged probes are shot into a person's body, so that an electric current runs through the entire body. This causes neuromuscular incapacitation. In other words, the person loses control over her own body because her muscles and nerves are entirely occupied with completing the circuit. If an individual is struggling with the police or otherwise presents a danger, the neuromuscular incapacitation can create a window in which the individual will stop resisting and can be secured. Probe mode also causes "intense [pain], felt throughout the

body." Brave Expert Report (Doc. No. 47-5) at 25.

Drive-stun mode is the mode which was used on Andrews. In drive-stun mode, the probes are taken off the Taser so only fixed electrodes remain. The electrodes are able to complete a circuit through the air, showing an arc of lightning-like electricity. See Brave Rep. Figure 6. When touched to a person's body, the circuit is completed through the top layer of skin and fat, leading to an extremely painful burning sensation. Andrews presents anecdotal evidence that a Taser in drive-stun mode can cause an individual's muscles to contract, incapacitating her, while McQueen's expert opines that drive-stun mode causes only pain and not incapacitation. In drive-stun mode, a Taser is "a pain compliance tool with limited threat reduction." Brave Rep. At 28. In other words, because it does not incapacitate an individual, it will not be as effective at ending a struggle, but it can cause an individual to comply with police orders by causing pain. McQueen's

7

expert Michael Brave provides evidence that drive-stun
mode does not cause lasting injury, beyond temporary burn
marks.

Finally, three-point mode is the name for when an
officer uses a Taser in both probe mode and drive-stun
mode at the same time, incapacitating a person and
causing her extra pain.

Andrews alleges that the Taser use was, at least in
part, retaliation for her filing a sexual-harassment
complaint against a Town of Hayneville police officer and
the subsequent termination of that officer.  However, she
provides   no   evidence   about   the   details   of   her
sexual-harassment complaint or whether McQueen or his
supervisor Williams would have any reason to know about
the complaint or the termination.

Andrews  presents  two  use-of-force  reports  from
incidents in October 2013, more than a year and a half
after McQueen used a Taser on her.  She also presents an
affidavit from an individual who says that he was abused

by other Lowndes County deputies.  The affidavit does not state the date of the incident.  Finally, she describes a number of encounters that she has had with Hayneville police officers[1] and Lowndes County deputies since the Taser incident.[2]

### III.  DISCUSSION

#### A.  Liability of McQueen

Andrews argues that the use of the Taser on her was an excessive use of force.  See Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.").

McQueen moved for summary judgment on qualified-immunity grounds.  "[G]overnment officials

---

1.  Hayneville is located in Lowndes County, Alabama.

2. This post-complaint harassment is not pled in the First Amended Complaint.  While it could have been considered as evidence if relevant, the court makes no determination as to the lawfulness of those events.

9

performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Since there is no dispute in this case that McQueen was acting within the scope of his discretionary functions when he tased Andrews, Andrews's lawsuit may continue only if, under her version of events, McQueen's Taser use violated her constitutional right against excessive force and the law was clearly established at the time of the incident that the Constitution prohibited such Taser use. Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012). If the action did not violate clearly established constitutional law, the court need not reach the question of whether her rights were violated. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The court will begin with the 'clearly established' analysis. "A right may be clearly established for

10

qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right,; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." <u>Lewis v. West Palm Beach, Fla.</u>, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations removed).

Andrews first seems to argue that the Taser use violated her clearly established constitutional rights because McQueen was not entitled to arrest her. There is a "broad statement of principle within the ... case law that clearly establishes" that such use of force would have been a constitutional violation. <u>Lewis</u>, 561 F.3d at 1292. Specifically, case law states that even de minimis force will violate the Fourth Amendment if the officer is not arguably entitled to arrest or detain the suspect. <u>Zivojinovich v. Barner</u>, 525 F.3d 1059, 1071 (11th Cir.

11

2008) (per curiam).

However, McQueen was legally entitled to arrest Andrews. An officer must have probable cause in order to arrest an individual. "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect ... is committing ... an offense.'" Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995)). McQueen knew that Andrews had come to the school to find her son's phone; he had participated in the search process. He then saw Andrews rush out of the inner administrative office and heard the assistant principal yell that he should stop her and that she should not leave the office with the phone. A prudent person in that circumstance would suspect that Andrews was committing the offense of theft.

Andrews seems to argue that McQueen did not have

12

probable cause to arrest her because she stated that she intended to return the flip phone when her son's phone was returned.   Implicit in this argument is the proposition that an intent to return the phone would mean that Andrews lacked the requisite intent to be guilty of theft under Alabama law.   See 1975 Ala. Code §§ 13A-8-1(2)(a); 13A-8-2(1).   However, the court need not reach the underlying question of Alabama criminal law.   Even if Andrews lacked the requisite intent and McQueen heard her vocal denial of the requisite intent, he still had probable cause to arrest her.   "[A] police officer need not credit everything a suspect tells him." Rodriquez v. Farrell, 294 F.3d 1276, 1278 (11th Cir. 2002).   A suspect's denial of intent does not deprive an arresting officer of probable cause.

The fact that McQueen was entitled to arrest Andrews does not resolve the question of whether the use of the Taser violated her clearly established right against excessive force.   Andrews acknowledges that there is no

13

case law from the Supreme Court, the Court of Appeals for
the Eleventh Circuit, or the Alabama Supreme Court "that
is materially similar to the current case." <u>Long v.
Slaton</u>, 508 F.3d 576, 584 (11th Cir. 2007).  However, she
argues that "general rules of law from ... earlier case
law ... appl[y] with 'obvious clarity' to the
circumstances," <u>id</u>., and that the Taser use was "so
egregious that a constitutional right was clearly
violated," <u>Lewis</u>, 561 F.3d at 1292.  However, the court
cannot agree, under either test.

The general rules of law on excessive force do not
apply with obvious clarity to McQueen's Taser use against
Andrews.  In excessive-force cases, "[a] court looks to
the 'totality of circumstances' to determine whether the
manner of arrest was reasonable." <u>Draper v. Reynolds</u>, 369
F.3d 1270, 1278 (11th Cir. 2004).  Looking to the
totality of the circumstances, the court must undertake
"a careful balancing of 'the nature and quality of the
intrusion on the individual's Fourth Amendment interests'

14

against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (internal quotations omitted)). This analysis must be done "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Oliver v. Fiorino, 586 at 905.

A number of factors can help to understand whether use of force in a particular instance was excessive. These include "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Draper v. Reed, 369 F.3d 127, 1277 (11th Cir. 2004). Other factors include "the severity of the crime at issue, whether the suspect posed an immediate threat, and whether the suspect actively resisted arrest." Graham, 490 U.S. at 396; accord Hoyt v. Cooks, 672 F.3d 972, 978-79 (11th Cir. 2012).

Because these factors require a fact-intensive

15

application, it is helpful to review the particular
circumstances of previous case law.  There are several
reported cases in which the Eleventh Circuit has
considered whether particular Taser use was
constitutionally excessive.  It has also analogized Taser
use to other nonlethal force, such as the use of pepper
sprays and similar chemical weapons.  See Fils v. City of
Aventura, 647 F.3d 1272, 1289 (11th Cir. 2011).

On the one hand, "these cases establish that
unprovoked force against a non-hostile and non-violent
suspect who has not disobeyed instructions violates that
suspect's rights under the Fourth Amendment."  Id.  For
example, the Fils court found clearly established
excessive force when the defendant officer had responded
to a bystander's comment of "they're overreacting, these
motherfuckers are overreacting" by using the Taser twice
in probe mode and once in drive-stun mode.  Id. at 1277.
Similarly, in Vinyard v. Wilson, 311 F.3d 1340 (11th Cir.
2002), the use of pepper spray on a handcuffed and

secured suspect while she was secured in the back of a
police car was found to be excessive.

On the other hand, police are permitted to use Tasers
in order to secure a suspect whom they reasonably
perceive as threatening. The Eleventh Circuit has
approved Taser use on a suspect who was "attempting to
kick and 'shin scrape' [and] head butt the deputies,"
Mann v. Taser Intern., Inc., 588 F.2d 1291, 1299 (11th
Cir 2009), and another suspect who appeared to be
spitting blood at an officer, Zivojinovich v. Barner, 525
F.3d 1059, 1073 (11th Cir. 2008). Furthermore, the
appellate court found that the use of a Taser in probe
mode was reasonable against a suspect who was "hostile,
belligerent, and uncooperative," but was not close enough
to the officer to pose an immediate threat. Draper v.
Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004). The
initial offenses in these cases are sometimes quite
minor, such as a broken tag light, Draper, 369 F.3d at
1272, or trespassing, Zivojinovich, 525 F.3d at 1063.

17

However, the potential threat posed by a suspect sufficiently alters the constitutional calculus as to allow a greater use of force.

In each of these cases the officer used the Taser in probe mode, at least once.[3]  In <u>Draper</u>, Eleventh Circuit contrasts such Taser use against a hypothetical "verbal arrest command accompanied by attempted physical handcuffing" which "may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt."  369 F.3d at 1278.  The Taser, in probe mode, allows an officer to avoid such a struggle because he can engage the Taser from a distance and the weapon incapacitates its target.

Examining Andrews's case through the lens of these precedents and the factors articulated in <u>Draper</u> and

---

3. The <u>Zivojinovich</u> court does not specifically note which mode was used, but it does describe the Taser as incapacitating the plaintiff.  Such incapacitation is consistent with probe mode and not with drive-stun mode.

18

Graham, this court cannot say that the Taser use was clearly established as excessive.

With regard to the need for use of force, Andrews was passively resisting an officer during arrest for a moderately serious misdemeanor; however, she posed no threat to the officer. Andrews's core offense was Theft of Property in the Third Degree, 18 U.S.C. § 13A-8-5, a Class A Misdemeanor. This is the least serious theft offense under Alabama law, for property with a value less than $ 500. Andrews was also charged with Disorderly Conduct, a Class C Misdemeanor, and Resisting Arrest, a Class B Misdemeanor. See Andrews Warrants, Pl.'s Ex. 6 (Doc. No. 52-3). This crime is relatively unserious, but more serious than the trespassing in Zivojinovich, 525 F.3d 1059, or the missing tag light in Draper, 369 F.3d 1270.

Next, there is no evidence that Andrews posed an immediate threat to McQueen. McQueen had her secured in front of the door. Although she was not following his

instructions and was emotional, he was able to hold the door shut and keep her from leaving the office. None of the witnesses, including McQueen, provide any indication that she was made any threatening or dangerous movements. Instead of describing his Taser use as a response to a threat, McQueen implies that he would have used his hands to secure Andrews, if she were not a woman. This factor does tilt in Andrews's favor.

The final question in determining the need for use of force is whether Andrews was "actively resisting arrest." Graham, 490 U.S. at 396. There is no question that Andrews was refusing to follow the instructions of the officer. However, there is a factual dispute as to whether she was actively or passively resisting. Andrews describes herself as having been unable to move once McQueen held the door shut. The assistant principal testified in deposition that Andrews stopped walking when McQueen asked her to, although she refused to relinquish the phone. McQueen, on the other hand, testified that

Andrews continued to try to open the door and leave. Making all reasonable inferences in Andrews's favor, the court cannot find that Andrews was actively resisting arrest or actively resisting McQueen's instructions. Any jury would find that she was not complying with McQueen's instruction, but a reasonable jury could find that she was merely <u>passively</u> resisting. However, there is no guidance in the case law regarding how the court (or an officer in McQueen's position) should consider such passive resistance in an excessive-force analysis. <u>See Chaney v. City of Orlando, Fla.</u>, 291 Fed. Appx. 238, 244 (11th Cir. 2008) (noting that Orlando Police Department policy encouraged Taser use as a response to passive resistance); <u>cf</u>. <u>Mann v. Darden</u>, 630 F.Supp.2d 1305, 1320 (M.D. Ala. 2009) (Thompson, J.) (repeated Taser use on psychiatric patient for passive resistance could be seen as "willful, malicious, in bad faith, and well beyond [officer's] authority" under Alabama law).

21

Turning to the extent of the injury inflicted, there is no reported Eleventh Circuit case which considered the use of a Taser in only drive-stun mode.  All of the cases involved probe mode, a significantly more intrusive and painful experience.  Drive-stun mode causes pain to a subject, but it generally leaves little lasting damage beyond a burn mark.  In this way, it is a less serious use of force than the Taser use discussed in the case law, whether constitutionally reasonable or excessive.

However, when the court considers the relationship between the need for use of force and the nature of the force used, the use of drive-stun mode makes the force seem less reasonable.  Drive-stun mode does not provide the advantages of distance and incapacitation,[4] which allow an officer to secure a suspect without exposing himself to potential injury.  It merely causes pain to the suspect.  A hostile, belligerent, and uncooperative

_____

    4.  Andrews herself offers some evidence that drive-stun Taser use does incapacitate a subject, but it is merely anecdotal and experiential, not scientific or technical.

22

suspect could just as easily punch, kick, or otherwise injure an officer during and after drive-stun Taser use as before.

Rather than allowing distance and creating time for an officer to secure a suspect, drive-stun Taser use is a "pain-compliance technique." From the record, it appears that the theory of the technique is part punishment and part threat. The officer can use the Taser, or another tool or technique, in order to cause a non-cooperative suspect pain, so that the suspect will be prodded into cooperating for fear of receiving additional pain. Such techniques have not been addressed by the Eleventh Circuit or the Supreme Court. However, this court finds pain compliance profoundly troubling as a practice. In many excessive-force cases, the suspect was injured incident to another police objective, such as stopping a fleeing suspect or handcuffing a violent individual. For a pain-compliance technique, the pain is the goal of the officer's action. Such techniques may be

23

an important option in some law-enforcement situations, especially where an alternative means of securing compliance has the potential of causing lasting injury rather than momentary pain.   However, it would seem dangerous to encourage frequent use of such practices. Cf. Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (use of force on a prisoner is excessive under the Eight Amendment protection against cruel and unusual punishment if used "maliciously and sadistically for the very purpose of causing harm").

Despite this court's misgivings about pain-compliance techniques, there is no case law on the subject.   Nor is there clear case law concerning drive-stun-only Taser use or appropriate responses to passive resistance when no threat is presented.   McQueen's Taser use was less extreme than those instances which the Eleventh Circuit has found to be constitutionally excessive, and in some ways is closer to those circumstances in which the Eleventh Circuit has endorsed more serious Taser use.

24

But see Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009) (drive-stun Taser use against misdemeanant who posed no threat but refused to follow officer instructions to hang up her cell phone was clearly established as excessive force within the Eighth Circuit).

In many ways, this case resembles Buckley v. Haddock, 292 Fed. Appx. 791 (11th Cir. 2008).  In that case, Buckley had gotten extremely emotional after he was pulled over for speeding.  He "began to sob" and "refused to sign the traffic citation." Id. at 792.  When he was warned that he would be arrested, he said "arrest me" and allowed himself to be handcuffed.  However, as he was walking to the car, he dropped to the ground and refused to move.  After several attempts to get Buckley to stand up, the sheriff's deputy warned him that he would be tased, "to which [Buckley] shouted, 'I don't care anymore--tase me.'" Id.  The deputy then used the taser, in drive-stun mode, three times before another deputy

25

arrived and Buckley was escorted to the police car.  Two
of the judges who sat on Buckley's appellate panel found
that the Taser use violated his rights against excessive
force, relying in part on the fact that video evidence
showed "an emotionally overwrought individual, through
sobs, <u>passively</u> refusing, if not unable, to comply with"
police orders.  <u>Id</u>. at 802 (Martin, D.J., dissenting)
(emphasis in original).  However, two of the appellate
judges held that the officer's Taser use was not clearly
established as excessive.[5]  Because it is unpublished,
<u>Buckley</u> is not binding legal authority and therefore
could not operate to clearly establish any law on
excessive force.  <u>See</u> 11th Cir. R. 36-2.  Furthermore,

---

        5. On the appellate panel which heard Buckley's case,
Judge Martin found there to be excessive force and that
the law was clearly established; another judge found
there to be excessive force and that the law was not
clearly established; and the third found that there was
no excessive force.  Since two judges found that the
right was not clearly established, the deputy was found
to be immune from suit.  Thus, while Judge Martin
represented a minority view on the question of whether
the Taser use was clearly established excessive force,
her view as to the constitutional violation was held by
a majority of the panel.

even if it were binding, the use of force against Andrews was more justified and less serious than that against Buckley, despite the parallels with regard to pain-compliance techniques, drive-stun Taser use, and passive resistance.

Nor did McQueen have clear guidance from the case law based on the fact that Andrews was visibly pregnant.  The Eleventh Circuit has issued only one reported case concerning use of force against a pregnant woman.  In Moore v. Gwinnett Cty., 967 F.2d 1495 (11th Cir. 1992), a woman who was eight-months pregnant refused to comply with police orders during a traffic stop and was arrested.  During the course of the arrest, the officer "'grabbed' her with both of his arms--taking her left arm in one hand and placing his right arm across her abdomen."  Id. at 1497.  Moore's pregnant status did not transform what was otherwise de minimis force into excessive force.  Id. at 1498-99.

More generally, when an officer is aware that arrestee has a preexisting vulnerability that would render the person particularly susceptible to injury, he may not knowingly use force which will cause serious injury to the arrestee, even if that force would cause little injury to another individual.  See Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002) (rejecting an excessive-force claim because reasonable officer would not have known of preexisting vulnerability).  In this case, the Taser use in drive-stun mode did not cause particular injury because of Andrews's pregnancy.  While there is evidence that McQueen did not know how the Taser would affect Andrews's unborn child, such uncertainty does not transform potentially reasonable force into clearly established excessive force.  Accord Williams v. Sirmons, 307 Fed. Appx. 354, 362 (11th Cir. 2009) (officer did not use excessive force when pressing pregnant woman into the ground with his knee to her back

because woman and fetus "w[ere]--miraculously--not harmed by the deputies' use of force").

In summary, Andrews cannot point to "case law with indistinguishable facts clearly establishing the constitutional right [or] a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right." Lewis, 561 F.3d 1291-92.  Therefore, McQueen is entitled to qualified immunity unless his conduct was "so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution." Willingham v. Loughnan, 321 F.3d 1299, 1303 (11th Cir. 2003).

The court cannot find that the Taser use was so far past that border.  The constitutional limits on drive-stun Taser use and of use of force against pregnant women are quite murky.  As noted above, at least one major police department in this region, the City of Orlando's, encourages Taser use in similar situations.

29

Chaney, 291 Fed. Appx. at 244.  Furthermore, Andrews's

case resembles one of the cases decided in Mattos v.

Agarano, 661 F.3d 433 (9th Cir. 2011) (en banc).  In that

case, the Court of Appeals for the Ninth Circuit

considered the case of a pregnant woman who had been

subject to drive-stun Taser use after passively resisting

arrest during a traffic stop.  Although the Ninth Circuit

found the Taser use to be excessive force, it held that

the right was not clearly established as of 2004.  Id. at

448; see also Buckley, 292 Fed. Appx. 791 (majority of

panel finding use of force not to be so egregious as to

be clearly established as excessive).  This court will

follow the guidance of the Buckley panel and of the Ninth

Circuit; McQueen's actions were not so egregious as to

violate clearly established constitutional law.


### B.  Liability of Williams

Andrews also brings claims against Lowndes County

Sheriff Williams, grounded in McQueen's actions.  "It is

well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). Instead, a plaintiff must prove that "there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Andrews argues that Williams negligently failed to train and supervise his deputies, including McQueen. In order for a plaintiff to show an adequate 'causal connection' between a supervisor's failure to train or failure to supervise and a constitutional violation, the plaintiff must show that the failure amounted to a "custom or policy [that] resulted in deliberate indifference to constitutional rights." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003). In order to determine whether a failure to train or to supervise

31

amounts to 'deliberate indifference,' the court uses the analysis for deliberate indifference in the municipal-liability context.  <u>Greason v. Kemp</u>, 891 F.2d 829, 837 (11th Cir. 1990).  "[A] plaintiff must present some evidence that the [supervisor] knew of a need to train and/or supervise in a particular area and the [supervisor] made a deliberate choice not to take any action."  <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998); <u>see also</u> <u>Bryan County, Okl. v. Brown</u>, 520 U.S. 397, 407-08 (1997) ("continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the 'deliberate indifference'-necessary to trigger ... liability")

Even if McQueen's Taser use violated Andrews's constitutional rights, Andrews provides no evidence that Williams knew or should have known of a need for any particular policies.  In fact, she offers no evidence of

any improper use of force by McQueen, or any other Lowndes County Deputy, before the incident at issue in this lawsuit.  Therefore, the court cannot find that Williams's approach to training and supervising McQueen amounted to deliberate indifference.

* * *

Accordingly, McQueen and Williams's motion for summary judgment will be granted.  An appropriate judgment will be entered in favor of them and against Andrews.

DONE, this the 30th day of September, 2015.


_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE